# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | **CIVIL ACTION 6:20-cv-00573-ADA** |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-00575-ADA** |
| **DEVELOPMENT,** | § | **CIVIL ACTION 6:20-cv-00577-ADA** |
| *Plaintiff,* | § | **CIVIL ACTION 6:20-cv-00585-ADA** |
| | § | |
| **v.** | § | |
| | § | |
| **GOOGLE LLC,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S REPLY IN SUPPORT OF
## OPENING CLAIM CONSTRUCTION BRIEF

# Table of Contents

I.      U.S. Patent No. 7,620,967 (Case No. 6:20-cv-00573) Disputed Claim Terms ...................1

        1.      "broadcast/broadcasting" ..............................................................................1

II.     U.S. Patent No. 8,559,928 (Case No. 6:20-cv-00575) Disputed Claim Terms .................2

        1.      "contact information"....................................................................................2

        2.      "tree structure" .............................................................................................3

III.    U.S. Patent No. 8,737,961 (Case No. 6:20-cv-00585) Disputed Claim Terms .................4

        1.      "stationary state"...........................................................................................4

        2.      "incrementing [of] a count[er] for a stationary state" ..................................5

        3.      "determin[e/ing] a primary set of stationary states" ...................................6

IV.     Terms of U.S. Patent No. 8,751,585 (Case No. 6:20-cv-00577-ADA) .............................8

        1.      "a list of actions" and "a plurality of actions" .............................................8

        2.      "moving the selected electronic message from the inbox to the
                archive location after detection of the action defined in the
                archiving rule" (claim 1), "to move the selected electronic message
                from the inbox to the archive location" (claim 9), and "moving the
                first electronic message from the  inbox of the electronic mail
                client associated with the user to the first storage location
                associated with the first archiving rule" (claim 17)....................................9

        3.      "client management processor configured to enable the user to
                select an electronic message from the inbox" (claim 9 only)...................11

        4.      "a detection processor configured to detect the action defined in
                the archiving rule assigned to the selected electronic message was
                carried out" (claim 9 only)........................................................................11

        5.      "a collaborative application management processor configured to
                manage collaborative applications" (claim 9 only) ...................................11

i

## TABLE OF AUTHORITIES

**Cases**

*3M Innovative Properties Co. v. Tredegar Corp.*,
  725 F.3d 1315 (Fed. Cir. 2013)....................................................................................... 3

*Computer Docking Station Corp. v. Dell, Inc.*,
  519 F.3d 1366 (Fed. Cir. 2008)....................................................................................... 3

*Dyfan, LLC v. Target Corp.*,
  6:19-cv-179-ADA, Dkt. 57 (W.D. Tex. Nov. 24, 2020)............................................. 11

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  424 F.3d 1374 (Fed. Cir. 2005)....................................................................................... 7

*Microsoft Corp. v. i4i Ltd. P'ship* ,
  564 U.S. 91 (2011)............................................................................................................ 5

*Optis Cellular Tech., LLC v. Kyocera Corp.*,
  No. 2:16-CV-0059-JRG-RSP, 2017 WL 541298 (E.D. Tex. Feb. 9, 2017)...................... 12, 13

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004)....................................................................................... 9

*St. Isidore Research, LLC v. Comerica Inc.*,
  No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246 (E.D. Tex. Sept. 19, 2016)...................... 12

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1369 (Fed. Cir. 2012)............................................................................... passim

*USB Bridge Sols., LLC v. Buffalo Inc.*,
  No. 1-17-CV-001158-LY, 2020 WL 1906898  (W.D. Tex. Apr. 17, 2020) ............................ 9

*Vitronics Corp. v. Conceptronic*,
  90 F.3d 1576 (Fed. Cir. 1996)......................................................................................... 3

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015)..................................................................................... 11

I.        **U.S. Patent No. 7,620,967 (Case No. 6:20-cv-00573) Disputed Claim Terms**

1.        **"broadcast/broadcasting"**

Google's proposed construction should be rejected at least for improperly importing limitations from the specification. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claim controls."). Google concedes that its original proposed construction was improper and is now proposing a revised construction of "simultaneously transmit/transmitting to all receivers in a network." Dkt. 34, 3.[1] However, Google's revised construction remains confusing and unclear in that it would require "simultaneously" transmitting.   The specification discusses "exploiting the bit rate fluctuations that constantly occur when a network is used." '967 patent, 1:66-67. That transmissions in a network are not necessarily instantaneous is an additional reason why Google's proposed construction should be rejected. Google argues that "[a] simultaneous transmission does not require simultaneous receipt or instantaneous transfer of data" and that, instead, "Google's construction reflects that the data being *broadcast* is sent to all receivers at the same time." Dkt. 34, 3 (emphasis altered). It is telling that Google felt obligated to clarify its own (revised) construction; and it is further telling that Google uses the term itself in that clarification. In doing so, Google tacitly concedes its revised construction is unnecessary and confusing. Moreover, Google's extrinsic evidence shows that this term does not necessarily transmit to "all receivers in a network." *See* Dkt. 34, 3-3 ("1. a radio-frequency transmission of an intelligence-bearing signal that is directed to numerous *unspecified* receiving stations. 2. The transmission or dissemination of signals to a large, *unspecified* number of receiving stations.") (emphasis added).

Google's citations to the specification and various extrinsic evidence are inapposite here given that (i) the word "simultaneous" does not appear anywhere in the specification, (ii) instead as the citations to the specification by Google show, the specification sufficiently illustrates the

---

[1] WSOU cites to its opening brief as "Dkt. 33" and Google's response brief as "Dkt. 34," as filed in Case No. 6:20-cv-573-ADA (which is the same for all the above-captioned cases).  WSOU cites to the pagination at the bottom of the page.

term, (iii) as Google's extrinsic evidence shows, the term was well known in the art, and (iv) none of Google's extrinsic evidence or arguments show that a person of ordinary skill in the art would now understand the term in light of the claims and specification, or that there was any disclaimer or lexicography. *Toshiba*, 681 F.3d at 1369 ("Absent disclaimer or lexicography, the plain meaning of the claim controls.").

## II.    U.S. Patent No. 8,559,928 (Case No. 6:20-cv-00575) Disputed Claim Terms

### 1.    "contact information"

This term should be given its plain and ordinary meaning. Google's proposed construction is confusing and unhelpful. It is unclear what "information related to the identity and communication with an entity" entails. However, the specification recites that contact information may comprise "names and to each name one or more telephone numbers can be stored, and in some cases also other information." '928 patent, 1:17-20 (emphasis added).  Google argues that its proposed construction at least encompasses "telephone numbers, addresses, and e-mail addresses" (Dkt. 34, 4), but Google fails to address the exemplary embodiments that include "other information." "Other information" such as "contact information about Mary in item 406 *can* comprise a photo, red-letter days, etc." '928 patent, 4:43-44 (emphasis added). To the extent Google's proposed construction can be understood, Google's proposed construction should be further rejected for improperly importing limitations not required in the claims or specification. In its Responsive Brief, Google does not address the above deficiencies and instead makes speculative accusations against WSOU (Dkt. 34, 4-5) and argues that WSOU fails to compare "plain and ordinary meaning" to Google's proposed construction. However, Google's arguments are without merit and only highlight Google's inability to defend its improper proposed construction. Specifically, Google failed to address the deficiencies in its proposed construction and has failed to explain how it is allegedly supported by any disclaimer or lexicography. *Toshiba*, 681 F.3d at 1369 ("Absent disclaimer or lexicography, the plain meaning of the claim controls.").

### 2.  "tree structure"

This term should be given its plain and ordinary meaning. That Google has revised its proposed construction (Dkt. 34, 5 n.1) demonstrates that its proposed construction is vague and unhelpful.  Google's (revised) proposed construction is also vague and unhelpful, and Google's proposed construction should be rejected for improperly importing limitations not required in the claims or specification. *Toshiba*, 681 F.3d at 1369 ("Absent disclaimer or lexicography, the plain meaning of the claim controls."). Google itself admits that "[a] "tree" was a well-known data structure." Dkt. 34, 6. For that reason alone, no construction is necessary. Moreover, there is nothing in the claims or specification that requires the specific elements of Google's proposed construction. And there is nothing in the claims or specification in describing a tree structure that recites or requires "non-linear," "ordered," "nodes," "connected graph," "parent node," or "children nodes," "each non-root node has at most one parent node," and "a unique hierarchy value." To the contrary, the specification discloses that a tree structure comprises of a plurality of logical levels. '928 patent, 1:40-41. Examples of a tree structure are depicted in Figures 2, 3, and 4. For example, Figure 2 depicts "an example of a group of contact information arranged in a tree structure with a plurality of logical levels." Moreover, as shown in the bottom level (205) of Figure 2, the second from the left node is connected to two nodes in the level above it, which expressly shows a preferred embodiment that does not require "each non-root node has at most one parent node." Google's proposed construction expressly excludes at least a preferred embodiment and, for at least that reason alone, should be rejected.  *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1584-85 (Fed. Cir. 1996).

Google argues that there was prosecution history disavowal or disclaimer; however, prosecution disclaimer does not apply to an ambiguous disavowal. *Computer Docking Station Corp. v. Dell, Inc*., 519 F.3d 1366, 1375 (Fed. Cir. 2008). "[I]n order for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." *3M Innovative Properties Co. v. Tredegar Corp*., 725 F.3d 1315, 1325 (Fed. Cir. 2013). Here, not only does Google fail to make a showing under the exacting standards of disavowal, the prosecution history itself does not support

any such disavowal. For example, the patentee merely cites to a Wikipedia page for an *example* of a tree structure. Dkt. 34-9, 6. This is shown by the sentence that cites to the Wikipedia page: "it is well understood that a 'tree structure' is a way of representing the "hierarchical" nature of a "structure" in a graphical form." *Id.* The patentee merely refers to "roots" and "nodes" to contrast against the prior art reference which had "no particular ordering." *Id.* For example, the patentee states: "A tree structure will typically be shown as a graph in the shape of a tree." *Id.* The patentee here merely presented examples illustrating that the prior art reference failed to disclose any "particular ordering." There was no clear and unmistakable disavowal. Google has failed to show that there was any disclaimer or lexicography. *Toshiba*, 681 F.3d at 1369 ("Absent disclaimer or lexicography, the plain meaning of the claim controls.").

### III.   U.S. Patent No. 8,737,961 (Case No. 6:20-cv-00585) Disputed Claim Terms

#### 1.   "stationary state"

This term should be given its plain and ordinary meaning. Indeed, it is odd that Google contends that this term is indefinite but proposes a definition which includes the term "stationary state" in the next disputed term. Regardless, the specification expressly teaches that a stationary state is "when the mobile device is determined to be not moving outside a specified area based on signal data" '961 patent, 2:37-40. Likewise, in another example, the specification discloses that "[w]hen mobile terminal 150 is not moving substantively, e.g., not moving outside a limited or otherwise specified area, the [wireless transmitter] identifiers indicated by successive signal data fields 203 are similar (changing slightly, for example, if one or more WiFi access points powers up or powers down or the user moves to different locations with an apartment)." *Id.*, 7:17-222. It also says "[w]hen a mobile terminal is frequently not moving with similar sets of transmitter IDs, those similar sets define a stationary state, e.g., a limited area where the user of the mobile terminal has a tendency to stay. *Id.*, 7:26-29. In another example, the specification recites that stationary states "represent the places that a user stays." *Id.*, 20:29-30. Moreover, the claim language itself provides context. For example, in claim 1, the claim recites "determining whether the mobile device is moving outside a specified area at a current time of the plurality of different times based

on the signal data," and "if the mobile device is determined to be not moving outside the specified area, then causing at least in part an incrementing of a count for a station state associated with the set of one or more distinct signal sources at the current time." *Id.*, 37:10-17.

Google fabricates illusory problems ostensibly from the intrinsic evidence. First, the so-called "semantic concepts" are merely labels that may be associated with a specified area. '961 patent, 20:28-30 ("the semantic concept of stationary states, which represent the places that a user stays."). Second, there is no issue regarding "how long a user must stay" (Dkt. 34, 11), at least because the specification provides exemplary embodiments, for example, ten minutes along with sampling intervals. *See e.g.*, '961 patent, 7:29-39, 12:35-50, 21:51-53, 25:28-51. Google admits that there is no such issue in its argument for the term "incrementing [of] a count[er] for a stationary state" (*see* Dkt. 34, 13). Third, there is nothing subjective about "[w]hen mobile terminal 150 is not moving substantively, e.g., not moving outside a limited or otherwise specified area, the [wireless transmitter] identifiers indicated by successive signal data fields 203 are similar (changing slightly, for example, if one or more WiFi access points powers up or powers down or the user moves to different locations with an apartment)." 961 patent, 7:17-222. All that describes is a user staying within the "limited or otherwise specified area," such as "an apartment." Thus, the specification as well as the claim language itself informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910-11. Google has not shown otherwise as to a person of skill in the art. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) (Under § 282 of the Patent Act of 1952, "[a] patent shall be presumed valid" and "[t]he burden of establishing in-validity of a patent or any claim thereof shall rest on the party asserting such invalidity.").

## 2.    "incrementing [of] a count[er] for a stationary state"

This term should be given its plain and ordinary meaning. Google's proposed construction at best attempts to re-word the claim language, which is unnecessary and confusing. Regardless, the claim language of incrementing of a count for a stationary state fully states the requirements of the term, and Google can only contrive straw-man arguments and speculate regarding WSOU's

alleged intent (*see* Dkt. 34, 14). Further, the specification teaches that in an exemplary embodiment, a stationary state record includes one or more count fields, and the count field "holds data that indicates the number of sample intervals for which that particular set of transmitter IDs was received simultaneously." '961 patent, 8:60-9:28. The specification teaches that when the stationary state record is updated, if, for example, there is a match to a set of transmitter IDs in a transmitter set field, then "the associated count is incremented." *Id.*, 13:51-60. Google has failed to point to any disclaimer or lexicography that would warrant departing from the plain and ordinary meaning is it proposes. *Toshiba*, 681 F.3d at 1369 ("Absent disclaimer or lexicography, the plain meaning of the claim controls.").

### 3.      "determin[e/ing] a primary set of stationary states"

This term should be given its plain and ordinary meaning. Additionally, the claims provide context for this claim term.  For example, claim 1 recites: "determining a primary set of stationary states, each stationary state in the primary set associated with a frequently incremented count…" '961 patent, 37:18-22. The specification discloses that Figures 11A and 11B "are graphs of cumulative distribution of most frequent stationary states for a mobile terminal accumulated incrementally over time…" *Id.*, 3:33-37. The specification goes on to disclose Tables 6 and 7, where Table 6 shows "Total number of stationary states" and Table 7 shows "Number of stationary states to account for 95% of stationary time."  For example, for User 1, the WiFi data stream type discovered 86 stationary states (Table 6), but only 5 stationary states (out of the 86) accounted for 95% of stationary time (Table 7). *Id.*, 23:15-22, 24:10-18.  In describing Figures 11A and 11B, the specification describes charting the fraction observations (of all observations) attributed to the first through sixth most frequent stationary states. *Id.*, 23:23-54. Thus, as the claim language itself recites, determining a primary set of stationary states includes stationary states with the most observations, or highest (most frequently) incremented counters.

Google apparently argues that a term must be indefinite unless the specification provides express lexicography. *See* Dkt. 34, 15 ("Although the patent promises later description in more detail, it never returns to the word "primary"). But as described above, the specification does

explain "determining a primary set of stationary states." Next, Google argues that the claim language "determining a primary set of stationary states, **each stationary state in the primary set associated with a frequently incremented count**…" is "necessary but not sufficient, for membership in the 'primary set of stationary states.'" Dkt. 34, 15. But Google provides no evidence of its contention. Instead, the claim language expressly provides what is necessary. Google then argues that the words "primary" and "frequent" are subjective, and then proceeds to provide various non-sequiturs. *Id.* at 16. However, again, as described above, the specification itself provides various exemplary embodiments. While acknowledging that the specification does provide numerous exemplary embodiments, it appears Google only complains of the lack of mathematical precision. *See Id.*, at 17 ("how many are among 'the most'?"). However, "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005). Then, giving Google the benefit of the doubt, Google *appears* to take an intentionally obtuse perspective of some of the exemplary embodiments, arguing that by showing a set of "most frequent" stationary states and using some numerical examples, somehow these exemplary embodiments are unhelpful because they cannot show "determining" because they instead show the "most frequent" stationary states that have already been determined. Dkt. 34, 16-17. Yet Google fails to address why a person of ordinary skill (like any lay person) would not understand from seeing the exemplary embodiments how to determine the most frequent stationary states by simply ordering the stationary states by descending frequency. Regardless, as shown above, by providing numerous exemplary embodiments, the specification as well as the claim language itself informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910-11.  Google has not shown otherwise as to a person of skill in the art. *See i4i*, 564 U.S. at 95 (Under § 282 of the Patent Act of 1952, "[a] patent shall be presumed valid" and "[t]he burden of establishing in-validity of a patent or any claim thereof shall rest on the party asserting such invalidity.").

**IV.     Terms of U.S. Patent No. 8,751,585 (Case No. 6:20-cv-00577-ADA)**

  **1.   "a list of actions" and "a plurality of actions"**

  In summarizing what its *newly modified* construction is allegedly intended to clarify, Google makes no mention of its "a finite number" limitation; and thus it at least tacitly concedes such an extraneous limitation is unnecessary verbiage that adds no clarification.   Dkt. 34, 20 ("Google's proposed construction clarifies that the list or plurality of actions required by the '585 patent is composed of selectable items that correspond to executable functions.").   Google also concedes that the term "a list of actions" encompasses "a list consisting of a single action."   *Id.*   It also remains undisputed that the above terms "are recited in qualified contexts that are sufficiently definitive on their face." Dkt. 33, 8-9.   Under these circumstances, no construction is required.

  Google failed in its response brief to persuasively defend its attempt to unduly limit ***all*** "actions" included within the "list" or the "plurality of actions" to only those that are both (1) ***selectable*** and (2) ***correspond to an executable function***.   As explained in WSOU's opening brief, independent claims 1 and 9 both expressly qualify the recited "list of actions" as being "detect[able] by the communication system," without reciting any universal "selectable" requirement.   Dtk. 33, 9-10.   Only the "action defined in the archiving rule" is expressly qualified as being "selected from the list of actions."   This claim language does not expressly preclude, for example, the possibility that other "actions" may be *included within* "the list of actions" and yet are not *selectable* as the action defined in the archiving rule.   This possibility (arising from a plain reading of the claim language) defeats Google's conclusory argument that "if [one] action is to be selected from a list of actions, [then all] the actions that make up that list must by definition be 'selectable.'"   Dkt. 34, 21.   Google's unexplained citation to a description of an example embodiment in the specification is unavailing because that passage contains neither lexicography nor disavowal for a universal "selectable" requirement.   *Id.* (citing '585 patent, 4:15-23).

  Google confirms in its response that its extraneous requirement, "every one corresponding to an executable function," is presumptively incorrect here.   According to Google, the "actions" "must be executable functions that can be detected by the communication system" ostensibly

because "[t]he claims [already] require that the actions 'can be subsequently carried out using at least some portion of the communication system.'"  Dkt. 34, 21.  If Google's construction adds nothing more than what is already recited in the surrounding context of the disputed term, as Google contends, than its construction is presumptively incorrect as rendering certain claim language superfluous.  *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("interpretations that render some portion of the claim language superfluous are disfavored.");  *USB Bridge Sols., LLC v. Buffalo Inc.*, No. 1-17-CV-001158-LY, 2020 WL 1906898, at *7 (W.D. Tex. Apr. 17, 2020) (rejecting a construction that "introduces superfluous language that already exists in the claims or includes elements (and limitations) not present in the disputed terms.").

> 2. **"moving the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule" (claim 1), "to move the selected electronic message from the inbox to the archive location" (claim 9), and "moving the first electronic message from the inbox of the electronic mail client associated with the user to the first storage location associated with the first archiving rule" (claim 17)**

Google fails to persuasively defend its rewrite of the claim language, which (for claim 1) is emphasized using underlining and ellipses as follows: "moving the selected electronic message from the inbox to <u>a different location in memory corresponding to</u> the previously defined archive location after <u>the communication system detect</u>[s] … the action defined in the archiving rule." Google does not dispute that its proposed universal construction glosses over claim differentiation expressed in these three distinct terms.  Dkt. 33, 12-13.  While Google indiscriminately argues "the claims require movement of a selected electronic message from the inbox to a particular location" (Dkt. 34, 19), Google offers no basis to dispute that claim 9, for example, "does not expressly require 'moving' the selected electronic image" (Dkt. 33, 12).  Rather, claim 9 "limits the 'event management process' in terms of a command it must be configured to generate," without "affirmatively require[ing] either generating or executing such a command."  Dkt. 33, 12.[2]

---

[2] Google should not be permitted to group distinct claim terms together for purposes of purporting

Google not only errs in incorrectly characterizing *movement* as a universal claim requirement, but it also compounds that error by seeking to restrict such movement to "a different location in memory."  Google's discussion of antecedent reference does not support adding such extraneous limitations.  Dkt. 34, 19.  Google notes that the terms "the archive location" and "the first storage location" make antecedent reference to "an archive location within the communication system" and "a first storage location within the communication system," respectively.  *Id*.  But this only underscores that the claims already expressly qualify the "moving" and "to move" limitations in terms of both *what* (the electronic message) and *where* (the archive / first storage location).  Under the circumstances, no further construction is required.

Google also fails to identify any lexicography or disclaimer that allegedly unambiguously requires *either* an unrecited relative limitation (expressed by Google as "a *different* location") *or* an extraneous "memory" element, much less a combination of both.  One of the passages Google cites, without explanation, includes the following statement: "[w]hen the message marked for moving is, on the one hand, already stored in an external database 115, and, on the other hand, the location indicated in the archiving command is a location 115 that is external to the electronic message client, the event management module 117, 118 of the communication system 1 can update the external database 115 without requiring transmission of the archiving command to the event electronic message client internal management module 217."  Dkt. 34, 19 (citing '585 patent, 7:35-54).  Nothing in that statement unambiguously requires movement to "a different location in memory."  Indeed, the word "memory" does not appear in the '585 patent.

Google's only alleged defense of its attempt to insert the extraneous requirement "the communication system detect[s]" is that "[t]he claims expressly require that the actions '**_can_** be detected by the communication system' . . . and the specification is replete with references to 'detection by the said communication system.'" Dtk. 34, 19 (emphasis added).  Use of the word "**_can_**" in this context is not reasonably interpreted as an unambiguous and universal requirement

_____

to comply with the Court's Order limiting the total number of disputed terms, only to then newly sneak into its response brief distinct constructions for each term.  *Cf*. Dkt. 34, 18 n.3.

that the action defined in the archiving rule **must** have been detected by the communication system, particularly where the "to move" limitations do not expressly attribute "detection of the action defined in the archiving rule" to any particular claim element.

      3.  **"client management processor configured to enable the user to select an electronic message from the inbox" (claim 9 only)**

      4.  **"a detection processor configured to detect the action defined in the archiving rule assigned to the selected electronic message was carried out" (claim 9 only)**

      5.  **"a collaborative application management processor configured to manage collaborative applications" (claim 9 only)**

| WSOU's Position | Google's Position |
|---|---|
| **3.** Not means-plus-function.<br><br>But if Section 112, ¶ 6 applies, then function is agreed and structure is message client 2. | Section 112, ¶ 6 applies; function: to enable the user to select an electronic message from the inbox; structure: indefinite. |
| **4.** Not means-plus-function.<br><br>But if Section 112, ¶ 6 applies, then function is agreed and structure is agent(s) 114a-114d. | Section 112, ¶ 6 applies; function: to detect the action defined in the archiving rule assigned to the selected electronic message was carried out; structure: indefinite. |
| **5.** Not means-plus-function.<br><br>But if Section 112, ¶ 6 applies, then function is agreed and structure is databases 107, 108, 109, database 110, databases 111, 112. | Section 112, ¶ 6 applies; function to manage collaborative applications; structure: indefinite. |

      Google has failed to raise sufficient evidence to rebut the presumption against applying means-plus-function construction to any of the above three terms. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).  Google misrepresents WSOU as "rest[ing] on the erroneous premise that there is a categorical rule that the term 'processor' avoids means-plus-function treatment." Dkt. 34, 23.  WSOU had identified multiple cases which found that the party seeking a means-plus-function construction had failed to rebut the applicable presumption against doing so for "processor configured to" terms.  Dkt. 33, 14-15 (collecting cases).  Google failed to meet its burden to show that the same reasoning and conclusion should not apply here.

      Google misplaces its reliance on a footnote in the unpublished opinion, *Dyfan, LLC v. Target Corp.*, 6:19-cv-179-ADA, Dkt. 57 at 20 & n.4 (W.D. Tex. Nov. 24, 2020).  In *Dyfan*, the defendant raised an indefiniteness challenge advanced expert testimony to support its position that

certain terms were subject to means-plus-function treatment under § 112, ¶ 6 and were indefinite as allegedly lacking any corresponding structure.  Here, Google relies exclusively on conclusory attorney argument and, in doing so, it grossly mischaracterizes the intrinsic evidence.

Google's citation to the unpublished opinion, *St. Isidore Research, LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *14 (E.D. Tex. Sept. 19, 2016), is helpful only to WSOU.  *St. Isadore* expressly recognized that "in many instances, the term 'processor' itself connotes sufficient structure and is not a 'nonce' or 'functional' word that is subject to the limitations of § 112, ¶ 6."  *Id*.  Moreover, the Eastern District of Texas has since distinguished the means-plus-function holding in *St. Isadore* on the facts.  *Optis Cellular Tech., LLC v. Kyocera Corp.*, No. 2:16-CV-0059-JRG-RSP, 2017 WL 541298, at *26 (E.D. Tex. Feb. 9, 2017).  In doing so, *Optis* held that the presumption against means-plus-function construction is underscored where, for example, "the claims and specification provide specific connection and interaction with other structural components."  *Id*.

Here, the processor claim language in question recites analogous connection and interaction with other structural components.  For example, claim 9 expressly recites the "client management processor" as (1) structurally tied to "an electronic message client" and (2) "enable[ing] the user to select an electronic message from the inbox," where "the plurality of electronic messages" are qualified as being "stored in a message storage database" (also a structural component).  Similarly, claim 9 expressly requires the "detection processor" to interact with other structural components, as expressed, for example, in the requirement that it must be "configured to detect the action defined in the archiving rule assigned to the selected electronic message was carried out."  The "detection processor" logically cannot "detect the action . . . was carried out" unless the "detection processor" is structurally tied to at least the portion of the communication system carrying out that action.  The burden rests with Google to rebut the presumption against means-plus-function construction, yet Google overlooks at least these example structural connections and interactions expressly recited in the claim.

Google also has not "pointed to an intrinsic record that establishes that 'processors' is meant here to generically be anything that manipulates data as opposed to connoting structure representing what is generally known as a processor." *Optis*, slip. op. \*26. Google could not do so because the specification expressly ties certain exemplary structure to the alleged functional language at issue. For example, the specification states "the communication system 1 may also comprise **collaborative application management** means such as, in particular: **databases 107, 108, 109** enabling recording of data related to Wiki pages, collaborative FAQs, or blogs[;] **a database 110**, enabling storing of data related to RSS flows emitted by collaborative applications[;] **databases 111, 112** enabling, among other things, storage of task information or planning information shared by different users 3, 31." '585 patent, 3:21-31 (emphasis added). This intrinsic evidence directly refutes Google's conclusory attorney argument, offered without any supportive expert testimony, that the specification merely refers to a "collaborative application management means," without disclosing *any* corresponding structure. *See* Dkt. 34, 24.

Regarding the "detection processor" recited in claim 9, the specification discloses, for example, "[d]etection of the performance of an action is rendered possible by using **different agents 114a to 114d** as mentioned above that control the different means of the communication system." *Id.*, 6:1-4 (emphasis added). Google attempts to trivialize this disclosure merely by offering the conclusory attorney argument that "agent" in this context is a nonce word. Dkt. 34, 24. Such conclusory attorney argument fails to establish that the exemplary "agent" structure here "is meant here to generically be anything that manipulates data as opposed to connoting structure representing what is generally known as a processor." *Optis*, slip. op. \*26. That the disclosed "agents" have particular structure and function consistent with what is generally known as a processor is confirmed, for example, by the respective descriptions of each agent and the statement that "[t]he entire set of components mentioned above is regularly controlled by agents 114a, 114b, 114c, 114d that principally control their operation, their presence and the different modifications they are subjected to." '585 patent, 3:39-42. Google failed to advance *any* evidence to conclude otherwise, much less any *clear and convincing* evidence supported by *expert testimony*.

13

As noted above, the claim language also structurally interconnects the "client management processor" with the "electronic message client." This is consistent with exemplary disclosure in the specification, such as, for example, the statement that "the electronic message client 2 enables the user, among other things, to select a message from the inbox to be transferred." *Id*., 4:8-10.

Google also errs in failing to give any meaningful effect to the "adjectival modifiers" which precede and structurally qualify each disputed processor term. Dkt. 34, 24. "([C]ontrary to WSOU's assertion, the adjectival modifiers preceding the term 'processor' in these terms are not 'structural descriptions.'") (citing Dkt. 33, 20). As shown at least by the example citations to the specification set forth above, the '585 patent uses those same "adjectival modifiers" (*e.g.*, "collaborative application management") to expressly tie each disputed processor term to respective structural descriptions, thereby *both* (1) further underscoring that each processor term connotes sufficiently definite structure *and* (2) further refuting the notion that any given processor term generically refers, instead, to *anything* that manipulates data. *See Optis*, slip. op. *26.

Google's indefiniteness challenge rests entirely on the conclusory attorney argument that the specification fails to disclose *any* corresponding structure for *any* of the three challenged terms. Dkt. 34, 25. Such an untethered characterization of the specification is clearly inconsistent with what is disclosed, lacks any expert testimony underpinning, and fails to prove indefiniteness by clear and convincing evidence. In addition, Google's argument that WSOU allegedly has "failed to address the second issue" and "forfeit[ed] any argument regarding alleged structure for these terms" ignores the fact that WSOU has consistently maintained that sufficient structure is recited in the disputed processor terms themselves. Dkt. 34, 22. As discussed herein, the specification also provides exemplary descriptions of sufficiently definite structure expressly tethered to the disputed processor terms. Given the burden lies with Google to overcome *both* the presumption against means-plus-function construction *and* the presumption of definiteness, and now that Google has filed its *initial* brief in which it advanced its claim construction theory and corresponding indefiniteness challenge, Google cannot reasonably argue that WSOU should be precluded from offering any rebuttal.

14

Dated: February 26, 2021           Respectfully submitted,

By:    */s/ Ryan Loveless*
James L. Etheridge
Texas Bar No. 24059147
Ryan S. Loveless
Texas Bar No. 24036997
Brett A. Mangrum
Texas Bar No. 24065671
Travis L. Richins
Texas Bar No. 24061296
Jeffrey Huang
Etheridge Law Group, PLLC
2600 E. Southlake Blvd., Suite 120 / 324
Southlake, TX 76092
Tel.: (817) 470-7249
Fax: (817) 887-5950
Jim@EtheridgeLaw.com
Ryan@EtheridgeLaw.com
Brett@EtheridgeLaw.com
Travis@EtheridgeLaw.com
Jhuang@EtheridgeLaw.com

Mark D. Siegmund
State Bar No. 24117055
mark@waltfairpllc.com
Law Firm of Walt, Fair PLLC.
1508 North Valley Mills Drive
Waco, Texas 76710
Telephone: (254) 772-6400
Facsimile: (254) 772-6432

*Counsel for Plaintiff WSOU Investments, LLC*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on this the 30th day of February 26, 2021.

*/s/ James L. Etheridge*
James L. Etheridge

15